UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SCOTT SANFORD, et al., ) | |
| ) | |
|     *Plaintiffs* ) | |
| ) | |
| v. ) | Civil No. 09-22-P-H |
| ) | |
| THE NATIONAL ASSOCIATION ) | |
| FOR THE SELF-EMPLOYED, ) | |
| INC., et al., ) | |
| ) | |
|     *Defendants* ) | |

### *RECOMMENDED DECISION ON MOTION TO DISMISS*

Defendant NASE Member Services, Inc. ("Member Services") moves pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss for lack of personal jurisdiction all claims asserted against it by plaintiffs Scott Sanford and John Locke on behalf of themselves and a putative class of Maine residents who were at some time members of co-defendant, the National Association for the Self-Employed, Inc. ("NASE"). *See* Defendant NASE Member Services, Inc.'s Motion To Dismiss for Lack of Personal Jurisdiction ("Motion To Dismiss") (Docket No. 8) at 1.[1] For the reasons that follow, I recommend that the motion be denied.

### I. Applicable Legal Principles

A motion to dismiss for lack of personal jurisdiction raises the question whether a defendant has "purposefully established minimum contacts in the forum State." *Hancock v. Delta Air Lines, Inc.*, 793 F. Supp. 366, 367 (D. Me. 1992) (citation and internal quotation marks omitted). The plaintiff bears the burden of establishing jurisdiction; however, where (as here)

---

[1] The plaintiffs filed a motion for class certification, *see* Docket No. 36, that has been stayed until the court rules on pending dispositive motions, *see* Docket Nos. 37-38, which, in addition to the instant motion, include motions by NASE for judgment on the pleadings and for partial summary judgment, *see* Docket Nos. 12-13. A motion by the plaintiffs for discovery pursuant to Federal Rule of Civil Procedure 56(f) also is pending. *See* Docket No. 17.

1

the court rules on a Rule 12(b)(2) motion without holding an evidentiary hearing, a *prima facie* showing suffices. *Archibald v. Archibald*, 826 F. Supp. 26, 28 (D. Me. 1993). Such a showing requires more than mere reference to unsupported allegations in the plaintiff's pleadings. *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). However, for purposes of considering a Rule 12(b)(2) motion, the court will accept properly supported proffers of evidence as true. *Id.*

## II. Factual Background

### A. The Plaintiffs' Claims

In their seven-count complaint, the plaintiffs allege on behalf of themselves and all Maine residents who belonged to NASE between August 1, 2004, and June 30, 2008, that:

1. The defendants made negligent misrepresentations (Count I). *See* Plaintiffs' Class Action Complaint ("Complaint"), attached to Notice of Removal (Docket No. 1), ¶¶ 99-110. Specifically, NASE (i) grossly underreported its earnings, (ii) concealed the amount of money it paid for administrative services, (iii) concealed the fact that it overpaid for these services, (iv) concealed the exorbitant compensation that it paid its officers and directors, (v) concealed the existence of its subsidiary, Member Services, and the role that Member Services played in these illegal activities, (vi) concealed that its directors and officers approved numerous and substantially overpriced, unnecessary, and one-sided financial deals with friends and business partners, (vii) concealed that, despite its claims to the contrary, some of the "member benefits" were not being offered at a discount, (viii) concealed that it had never requested discounts on those benefits, (ix) misrepresented the value and quality of certain member benefits, and (x) concealed that its application fee and annual dues were excessive. *See id.* ¶ 106.

2. The defendants breached their contract with members in the manner set forth in paragraph 106, above (Count II). *See id*. ¶¶ 111-19. The defendants also overcharged the plaintiffs for dues, member services, and application fees, squandered the members' assets, and concealed the nature and extent of this misconduct. *See id*. ¶ 117.

3. The defendants breached their fiduciary duty to the plaintiffs (Count III). *See id*. ¶¶ 120-30. They did so by charging excessive fees and dues, underreporting the association's income, forgoing commissions on member benefits, overpaying outside entities for administrative services, engaging in sham transactions with outside entities, paying their officers and directors excessive compensation, paying consultants excessive fees, paying exorbitant amounts for travel, occupancy, and other business expenses, and concealing the nature and extent of those financial improprieties from the members. *See id*. ¶ 129.

4. NASE violated its duty to act in good faith pursuant to 13-B M.R.S.A. § 717 (Count IV). *See id*. ¶¶ 131-39. Specifically, NASE directors and officers intentionally misled members about the organization's revenues, knowingly overpaid for administrative services such as agent commissions, acquisition of member benefits, and marketing, paid themselves exorbitant salaries and compensation, hired their business associates as consultants and paid them exorbitant fees, spent excessive amounts on consultant fees, programs, travel, and other expenses, prevented members from active and meaningful participation in the nomination and election of directors, charged excessive application fees and annual dues, failed to remit to the members the commissions earned from the sale of ancillary services or, in the alternative, failed to apply them to the association's overhead costs, entered into multiple one-sided contracts with outside corporations in which NASE paid for unnecessary and/or overpriced services, failed to negotiate discounts from suppliers of member benefits despite the obligation to do so, cooperated

with private health insurance carriers and the health insurance industry to the detriment of the association members, pursuing legislative, policy, and business goals favored by the insurance industry but antithetical to the members' interests, concealed the nature and extent of this cooperation from members, and misrepresented the nature and quality of some member benefits. *See id*. ¶ 136.

5. The defendants engaged in constructive fraud (Count V), inducing members to transfer assets to them in the form of fees and dues and exploiting an undue advantage over the members, to their economic detriment. *See id*. ¶¶ 140-51.

6. NASE violated 24-A M.R.S.A. § 1901 *et seq*. (Count VI) by acting as MEGA Life's third party administrator without obtaining a license to operate as such, failing to post a bond, and co-mingling its funds with those of MEGA Life, in contravention of 24-A M.R.S.A. § 1901 *et seq*. *See id*. ¶¶ 152-58.

7. The defendants failed to fulfill their duty of accurate accounting with respect to NASE's finances (Count VII). *See id*. ¶¶ 163-64.

### B. Member Services: Background

Member Services is a business corporation incorporated under the laws of Delaware, with its principal place of business in Texas. *See* Declaration of Michael Beene in Support of NASE Member Services, Inc.'s Motion To Dismiss (Docket No. 9) ¶ 2. It is a wholly owned subsidiary of NASE, a Texas non-profit corporation. *See id*. ¶ 3. Michael Beene is an officer and director of both Member Services and NASE. *See id*. ¶¶ 1, 3. NASE is a national membership organization for entrepreneurs and small businesses with a mission of offering support, benefits, and consolidated buying power to its members. *See id*. ¶ 3.

Member Services is not a membership organization and has never had any dealings with members of NASE. *See id*. ¶ 4. As such, Member Services has never had direct contact with the named plaintiffs in this action or any other members of NASE, except for officers and directors of NASE. *See id*. NASE is responsible for making all decisions with regard to its membership and is registered to do business in the State of Maine. *See id*.

As a service to NASE, Member Services periodically contracts with vendors to provide certain membership benefits available to NASE members. *See id*. ¶ 5. None of those vendors is located in Maine, and the vendor contracts are not negotiated or executed in Maine. *See id*. Member Services does not direct the vendors with whom it contracts to engage in activity in Maine. *See id*.

Member Services maintains no offices or employees in Maine. *See id*. ¶ 6. It does not maintain any operations, nor conduct, transact, or solicit any business in Maine. *See id*. ¶ 7. It does not process, manufacture, or sell any products in Maine. *See id*. It has never registered as a foreign corporation in Maine or been authorized to transact business in Maine. *See id*. ¶ 8. It does not have an agent for service of process, a telephone listing, or a bank account in Maine. *See id*. ¶¶ 9-10. It does not own any property or pay any taxes in Maine. *See id*. ¶ 11.

### C. NASE's Form 990 Information; Relationship With Member Services

Every so-called section 501 organization exempt from federal income tax is required to file a Form 990 on an annual basis unless it qualifies for certain specified exemptions. Declaration of Thomas F. Cusick in Opposition to NASE Member Service[s'] Motion To Dismiss, attached to Plaintiffs' Reply to NASE Member Services, Inc.'s Motion To Dismiss Under F.R.Civ.P. 12(b)(2) ("Dismiss Opposition") (Docket No. 11), ¶ 8. For calendar year 2004, NASE reported "program service" revenue of $4,184,260 from "service fees from

members[.]" *See id*. ¶ 9(a). NASE reported revenue identified as membership dues and assessments in the amount of $3,299,956 for calendar year 2005, $4,435,050 for calendar year 2006, and $5,000,040 for calendar year 2007. *See id*. ¶ 9(b)-(d). Other than interest earned on savings and temporary cash investments, NASE reported no other sources of revenue for the years 2004 through 2007. *See id*. ¶ 10.

For those years, Part IX of Form 990 required NASE to provide information regarding its "taxable subsidiaries and disregarded entities." *See id*. ¶ 11. For 2004 through 2007, NASE listed only one such entity, Member Services. *See id*. ¶ 12. For each of those years, Member Services' address was listed as 1235 S. Maine Street, Suite 100, Grapevine, TX 76051. *See id*. ¶ 14. That was also NASE's address during that period. *See id*. ¶ 15. From 2004 through 2007, NASE owned 100 percent of Member Services. *See id*. ¶ 16.

For 2004, 2006, and 2007, NASE did not report any total income or end-of-year assets figure for Member Services. *See id*. ¶¶ 17, 23, 28. However, NASE reported that at the end of 2004 it owed its "affiliate" $4,272,827. *See id*. ¶ 18. The affiliate was not identified by name. *See id*.

On its 2005 Form 990, NASE listed Member Services as having total income of $1,245,292 and end-of-the-year assets of $8,004,990. *See id*. ¶ 20. NASE also listed a "note receivable from subsidiary" in the amount of $800,000. *See id*. ¶ 21. It claimed an amount "due to affiliate" of $4,272,827 at the beginning of the year, the same amount due to its "affiliate" at the end of 2004, and $2,448,741 at the end of the year. *See id*. ¶¶ 18, 22.

On its 2006 Form 990, NASE listed a year-end note receivable from subsidiary in the amount of $134,061. *See id*. ¶ 26. It reported that, at the beginning of the year, there was an $800,000 balance on the note. *See id*. NASE claimed an amount "due to affiliate," at the

6

beginning of the year, of $2,448,741, the same amount due its "affiliate" at the end of 2005. *See id*. ¶ 27. It claimed that $1,215,361 was "due to affiliate" at the end of the year. *See id*.

NASE and Member Services had common directors and officers. The 2006 NASE Form 990 reported NASE's officers, directors, and chairmen of the board for that year as Robert Hughes, Robert Pool, James Hambuchen, Charles Montgomery, Shonda Parker, John Wright, David Alders, R. Michael Beene, and John Crowder. *See id*. ¶ 24. Each of those nine individuals also received compensation from wholly owned Member Services, which paid them a total of $248,667. *See id*. ¶¶ 24-25.

On its 2007 Form 990, NASE listed Robert Hughes, James Hambuchen, Charles Montgomery, Shonda Parker, John Wright, David Alders, R. Michael Beene, and John Crowder as its "current officers, directors, trustees and key employees[.]" *See id*. ¶ 29. Each of those individuals again received compensation from Member Services, which paid them a total of $1,012,875. *See id*. ¶¶ 29-30. Of that amount, Hughes received $610,875. *See id*. ¶ 31.

Under Part V-A of the 2007 Form 990, NASE was required to report compensation paid to current officers, directors, trustees, and key employees. *See id*. ¶ 32. Part V-A also required NASE to report, on a weekly basis, the average hours that each individual devoted to this work. *See id*. ¶ 33. NASE reported that Hughes earned a total of $388,354 in his role as the organization's "president/director," in which capacity he averaged approximately 40 hours per week. *See id*. ¶ 34. NASE reported that Beene earned a total of $191,250 for his services as "secretary/director" of the organization, in which capacity he worked an average of 40 hours per week. *See id*. ¶ 35. Member Services paid Beene $98,500 in 2007. *See id*. ¶ 37. Beene's combined 2007 income from NASE and Member Services was $289,750. *See id*. ¶ 38. Hughes' combined 2007 income from NASE and Member Services was $999,229. *See id*. ¶ 39.

7

In 2007, NASE paid its eight officers, including its president and secretary/director, a combined total of $780,604. *See id*. ¶ 40. In 2007, NASE and Member Services paid their officers and directors a combined total of $1,793.479. *See id*. ¶ 41.

On its 2006 Form 990, NASE reported a total of eight employees in the pay period including March 12, 2006. *See id*. ¶ 42. On its 2007 Form 990, NASE reported a total of eight employees in the pay period including March 12, 2007. *See id*. ¶ 43. According to Part IX of NASE's 2007 Form 990, Member Services is a taxable subsidiary of NASE. *See id*. ¶ 44. Unlike Form 990s, the tax returns of taxable entities are not automatically available for public inspection. *See id*. ¶ 45.

### D.  NASE's Activities in Maine

On June 21, 2004, Scott Sanford met with Christine Gregor, a sales agent for both the MEGA Life and Health Insurance Company ("MEGA Life") and NASE, at Sanford's house in Falmouth, Maine. *See* Declaration of Scott Sanford in Opposition to NASE Member Service[s'] Motion To Dismiss, attached to Dismiss Opposition, ¶ 3. During that meeting, Gregor told Sanford that she lived in Maine. *See id*. ¶ 4. Her business telephone number had a Maine exchange. *See id*. ¶ 5. In addition, NASE had telephone listings in both the White Pages and the Yellow Pages of the Verizon directory for Portland, Maine. *See id*. Maine-based sales agents also advertised on the internet. *See id*.

During that meeting, Gregor enrolled Sanford in a number of MEGA Life health plans and riders. *See id*. ¶ 6. Toward the end of the meeting, she suggested that Sanford also join NASE. *See id*. ¶ 7. She told him that membership in NASE would allow him to purchase a discount pharmacy card, which in turn would save him money on prescription drugs. *See id*. Otherwise, he would have to pay the full retail price, since none of the MEGA Life plans

provided prescription coverage. *See id*. Sanford joined NASE in large part because of the discount pharmacy card. *See id*. ¶ 8.

Before leaving Sanford's house, Gregor had him sign a NASE membership application. *See id*. ¶ 9. She did not ask him to fill out the form, nor did she fill it out herself. *See id*. ¶ 10. He received a form by mail from MEGA Life, not NASE, after his membership became official. *See id*. NASE charged him a $25 application fee. *See id*. ¶ 11. The application process was limited to printing his name and then signing and dating the form. *See id*.

Before concluding the June 21 meeting, Gregor asked Sanford to authorize a monthly electronic transfer of funds from his bank account at Bath Savings Institution to NASE. *See id*. ¶ 12. Bath Savings Institution has a branch office in Falmouth, Maine. *See id*. Gregor informed Sanford that his MEGA Life insurance premiums would be combined with the NASE payment. *See id*. NASE would be the named payee. *See id*. Gregor stated that the NASE dues were $8.00 per month, and the discount pharmacy card was an additional $4.00. *See id*. ¶ 14. At some point during 2005, NASE raised the monthly dues to $10.00. *See id*.

Gregor told Sanford that his enrollment in NASE and his coverage under MEGA Life would be automatically canceled if he failed to make a scheduled payment. *See id*. ¶ 15. Before she left Sanford's house, Gregor requested a personal check from him in the amount of $958.00 payable to NASE. *See id*. She told him that this amount reflected costs of the application fee for MEGA Life coverage, the application fee for NASE membership, the initial monthly dues for NASE, the initial MEGA Life premiums, and the first month's fee for the discount pharmacy card. *See id*. ¶ 17.

In making her sales pitch for NASE membership, Gregor assured Sanford that the organization would protect his interests as a self-employed individual. *See id*. ¶ 18. Gregor

9

informed him of the NASE web site and encouraged him to log on for information about the organization and to learn about member benefits. *See id*. ¶ 19. At least once a month from June 2004 through March 2008, Sanford received magazines, newsletters, and other printed material from NASE, delivered by the United States Postal Service and addressed to him at his home in Falmouth, Maine. *See id*. ¶ 20. These materials contained misleading information. *See id*. For instance, in its 2006 annual report, NASE claimed $4,435,000 in total revenue from member dues and fees. *See id*. Sanford has since learned that the true amount was much higher. *See id*.

On occasion, while Sanford was a member of NASE, he logged on to the official NASE web site, www.nase.org. *See id*. ¶ 21. Under the heading "About Nase," there were subsections titled "Frequently Asked Questions," "Disclosures and Policies," and "Media Resources." *See id*. ¶¶ 22-24. There was also a section concerning the NASE's "Governing Principles." *See id*. ¶ 22. The Disclosures and Policies subsection stated that "the membership dues derived from the sale of memberships go to the NASE." *Id*. ¶ 25. The Frequently Asked Questions subsection asserted that (i) "NASE . . . offers a full range of benefits . . . at discounted rates[,]" and (ii) "the NASE has approximately 250,000 members." *Id*. ¶ 26. A NASE press release dated January 12, 2005, used the same membership figure. *See id*.

The Governing Principles section stated that the NASE board of directors "believes that [its] primary responsibility . . . is to oversee the affairs of the Association for the benefit of the members" and "that the long-term success of the Association is dependent upon the maintenance of an ethical business environment[.]" *Id*. ¶ 27. NASE never informed Sanford of the existence of Member Services. *See id*. ¶ 28. When he entered "NASE Member Services, Inc." on Google, there were no matches. *See id*. He obtained the same result when he searched for Member

Services on Yahoo. *See id*. On the other hand, when he entered "National Association for the Self-Employed," Google found 49,700 "results." *See id*.

NASE did not disclose to Sanford the amount of compensation it had paid to Hughes and the other board members in 2006 and 2007. *See id*. ¶ 29. NASE never told him that, in 2007, Member Services paid more than $1,000,000 to its eight officers and directors or that these individuals also served as officers and directors of NASE. *See id*. The nonprofitcareerguide.org web site lists median income for "top program position by organization's budget size." *Id*. ¶ 31. According to this site, the median compensation paid to top administrators working for organizations with budgets between $5,000,001 and $10,000,000 is $75,085. *See id*.

### III. Discussion

Member Services seeks dismissal of the complaint against it on the ground that it has no contacts with Maine, precluding a finding that this court can exercise either general or specific jurisdiction over it. *See* Motion To Dismiss at 4-9. The plaintiffs do not contest that Member Services lacks such contacts, but argue that (i) NASE's Maine contacts should be imputed to Member Services because the two lack corporate separateness, (ii) alternatively, NASE's in-forum activities should be imputed to Member Services under such legal doctrines as joint venture and agency, and (iii) alternatively, the court should defer ruling on the matter to permit the plaintiffs to engage in limited jurisdictional discovery. *See* Dismiss Opposition at 1-7.

Member Services rejoins that (i) even if the plaintiffs are correct that Member Services is under the complete control of its parent, which it asserts they are not, the rationale that supports jurisdictional veil-piercing does not apply on the facts as alleged, and (ii) the plaintiffs are not entitled to jurisdictional discovery. *See* NASE Member Services' Reply in Support of Its Motion To Dismiss ("Dismiss Reply") (Docket No. 16) at 1-2.

"The personal jurisdiction of a federal court sitting in diversity is equivalent to that of a state court sitting within the forum." *Amburgey v. Atomic Ski USA, Inc.*, No. 2:06-CV-149-GZS, 2007 WL 1464380, at *1 (D. Me. May 17, 2007), *recon. denied*, 2007 WL 2028954 (D. Me. July 10, 2007). "Thus, to establish personal jurisdiction over Defendants, Plaintiffs must demonstrate both that Maine's long-arm statute grants jurisdiction and that exercise of jurisdiction under the statute is consistent with the Due Process Clause of the United States Constitution." *Id*. "Because Maine's long-arm statute is coextensive with the permissible exercise of personal jurisdiction under the Constitution, the due process inquiry controls in the present case." *Id*.

As my colleague, Magistrate Judge Kravchuk, has observed:

> The Maine Supreme Judicial Court (Law Court) has not yet been called upon to pierce a corporate veil in order to establish personal jurisdiction. Otherwise, the Law Court holds that a court may pierce the corporate veil when equity so demands, and may disregard the corporate entity when used to cover fraud or illegality, or to justify a wrong. The prescribed standard requires a plaintiff to establish that the defendant abused the privilege of a separate corporate identity and that an unjust or inequitable result would occur if the court recognized the separate corporate existence. With respect to the more specific jurisdictional issue, federal common law in this Circuit indicates that a showing of mere corporate ownership or common management will not be sufficient to justify veil piercing. Rather, the determinative factor is control. This statement of the federal common law is consistent with the first element of the Law Court's standard.

*EnvisioNet Computer Servs. v. MicroPortal.com, Inc.*, No. 00-225-P, 2001 WL 179882, at *8 (D. Me. Feb. 14, 2001) (rec. dec., *aff'd* Mar. 28, 2001) (citations, internal punctuation, and footnotes omitted). This remains an accurate summary of the state of the relevant law.

### A. Haling a Dominated Subsidiary Into Court on Basis of Parent's Forum Contacts

Member Services argues that even if one accepts at face value the plaintiffs' assertion that it is dominated by NASE, a dominated subsidiary cannot as a matter of law be subjected to personal jurisdiction solely by virtue of its dominating parent's forum contacts. *See* Dismiss Reply at 2-4. Instead, it argues, only the reverse is true: that the forum contacts of a dominated

subsidiary corporation can subject its dominating parent to personal jurisdiction. *See id*. For this proposition it relies on (i) a statement of Judge Kravchuk in *EnvisioNet*, (ii) the plaintiffs' failure to cite a single case in which a court has exercised personal jurisdiction over a subsidiary based on the forum contacts of its parent, and (iii) the holdings of two cases from other jurisdictions, *Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012 (10th Cir. 1990), and *Purple Onion Foods, Inc. v. Blue Moose of Boulder, Inc.*, 45 F. Supp.2d 1255 (D.N.M. 1999). *See id*.

Judge Kravchuk stated in *EnvisioNet*: "If a corporation having minimum contacts with the state is nothing more than a shell or puppet through which a defendant lacking contacts with the state acts, the exercise of jurisdiction over the latter is proper because the minimum contacts of the former are attributed to the latter." *EnvisioNet*, 2001 WL 179882, at *8. While, at first blush, her statement might be construed to support Member Services' position, I do not think it fairly can be read to suggest that a dominated subsidiary cannot as a matter of law be haled into court on the strength of its parent's forum contacts. Judge Kravchuk was not presented with such a scenario. Instead, she had before her a request to conduct discovery for purposes of proving the paradigmatic case of absent investor companies' alleged control or domination of affiliates with forum contacts. *See id.* at *2, *8.

Further, while *Home-Stake* and *Blue Moose* do in fact support Member Services' assertion, and the caselaw addressing the atypical scenario in which a plaintiff seeks to hale into court a dominated subsidiary on the basis of its dominating parent's forum contacts is sparse, that caselaw is not monolithic.

In *Home-Stake*, the United States Court of Appeals for the Tenth Circuit indeed found that, while it is appropriate to hold a corporate parent to answer for conduct within a forum carried out by an *alter ego* subsidiary, "the rationale of these cases does not support the

13

proposition that, because the court has jurisdiction over a parent corporation or dominating individual, without more, it has jurisdiction over the alter ego corporation." *Home-Stake*, 907 F.2d at 1021. The court reasoned, "The dominated corporation does not direct and control its dominating corporate or individual alter ego." *Id*. "Accordingly, it is unfair to impute to the dominated corporation the forum contacts of its alter ego." *Id*. (footnote omitted).

In *Blue Moose*, the United States District Court for the District of New Mexico applied *Home-Stake*, holding that "Blue Moose, as the allegedly dominated corporation, must have sufficient contacts of its own with New Mexico in order to be subject to suit in this district. Tellam's contacts with this forum will not be attributed to Blue Moose, even if Blue Moose is merely an alter ego for Tellam." *Blue Moose*, 45 F. Supp.2d at 1259. The court reasoned:

> This difference in treatment regarding attribution of contacts may be the result of an unspoken desire to avoid infringing on the benefits conferred by corporate status, unless it is necessary to do so to avoid an unjust result. Where the dominating individual has sufficient contacts with the forum state, it is not necessary to bring in the dominated corporation to have a viable case. The guilty party, so to speak, is already before the court. In the reverse situation, however, the dominating individual who is the true actor will be out of reach of the forum state unless the contacts of the dominated corporation can be attributed to the individual.

*Id*. at 1259 n.3.

Yet outside of the Tenth Circuit, there is authority for the proposition that a dominating parent's contacts may subject its dominated subsidiary to a forum's jurisdiction. *See, e.g., Dainippon Screen Mfg. Co. v. CFMT, Inc*., 142 F.3d 1266, 1271 (Fed. Cir. 1998) ("While a patent holding subsidiary is a legitimate creature and may provide certain business advantages, it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction.") (footnotes omitted);

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*, Civil Action No. 04-332 (EGS), 2006 WL 2711527, at *13 (D.D.C. Sept. 21, 2006) (noting, in case in which the plaintiffs alleged that the court had personal jurisdiction over foreign subsidiary defendants under an *alter ego* theory, "The courts will impute personal jurisdiction under an alter ego theory in cases where the parent company so dominated the subsidiary corporation as to negate its separate personality.") (citation and internal punctuation omitted); *Holme v. Global Minerals & Metals Corp.*, No. 600232/08, 2009 WL 387034, at *2 (N.Y. Sup. Ct. Jan. 12, 2009) (noting that, while personal jurisdiction over parent corporation did not in and of itself give rise to jurisdiction over a wholly owned subsidiary, jurisdiction over subsidiary would be established if the parent so controlled and dominated the subsidiary that it was a mere department of the parent); 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069.4 (Supp. 2009), at 143-44 ("There is a reluctance to exercise personal jurisdiction over a subsidiary merely because its parent corporation is doing business in the forum state.  In determining whether a subsidiary corporation is subject to the jurisdiction of a forum state because its parent corporation is present or doing business there, the court should determine whether the subsidiary is separate and distinct from its parent corporation for personal jurisdiction purposes.  The court should take into account the amount of the subsidiary's stock owned by the parent corporation, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent's control over the general policy and administration of the subsidiary.") (footnote omitted).

In my view, this latter line of authority better harmonizes than *Home-Stake* and its progeny with the Law Court's approach of permitting disregard of the corporate entity if a plaintiff proves "(1) some manner of dominating, abusing, or misusing the corporate form; and (2) an unjust or inequitable result that would arise if the court recognized the separate corporate

existence." *Johnson v. Exclusive Props. Unltd.*, 1998 ME 244, ¶ 6; 720 A.2d 568, 571. Accordingly, I reject Member Services' argument that, even if it is dominated and controlled by NASE, that domination cannot as a matter of law subject it to jurisdiction in this court.

While Member Services asserts in passing that, in fact, it was not dominated or controlled by NASE, *see* Dismiss Reply at 4, it makes no reasoned argument as to how the plaintiffs' evidence falls short of making such a showing, *see generally id*. This alone justifies denial of its motion to dismiss. *See, e.g., Graham v. United States*, 753 F. Supp. 994, 1000 (D. Me. 1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.") (citation and internal quotation marks omitted).

### B. *Prima Facie* Showing

In any event, the plaintiffs' *prima facie* showing suffices to meet their burden of proving that this court has jurisdiction over Member Services. This is so because:

1. A showing meeting the requisites of the Law Court's veil-piercing test, in itself, suffices to expose a subsidiary to personal jurisdiction in this forum if its parent corporation is subject to such jurisdiction. *See, e.g., Oceanic Exploration*, 2006 WL 2711527, at *13; *Holme*, 2009 WL 387034, at *2.

2. Member Services does not contest that its parent, NASE, is subject to this court's jurisdiction. *See generally* Dismiss Reply. In any event, the plaintiffs demonstrate that, *via* at the least specific jurisdiction principles, it is appropriate for this court to exercise personal jurisdiction over NASE. *See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088-89 (1st Cir. 1992) (specific jurisdiction is based on a relationship between the forum and the particular acts or injuries that provide the basis for the action, that is,

"where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts"); *Scott v. Jones*, 984 F. Supp. 37, 43 (D. Me. 1997) (general jurisdiction arises when the defendant has engaged in substantial or systematic and continuous activity in the forum state). The plaintiffs allege, *inter alia*, that NASE breached its contract with, and fiduciary duties to, members and made material misrepresentations to them. Their cause of action arises directly out of, or relates to, NASE's purposeful forum contacts, which include (i) solicitation of members in Maine *via* Maine-based sales representatives, advertising in Maine phone books, and an internet presence, (ii) collection of application fees and membership dues from Maine residents, and (iii) transmission of materials, including some containing alleged misrepresentations, through U.S. mail to NASE members located in Maine.

       3.      The plaintiffs adduce sufficient evidence to make a *prima facie* showing satisfying the first prong of Maine's veil-piercing test, inquiring whether there was "some manner of dominating, abusing, or misusing the corporate form[.]" *Johnson,* 1998 ME 244, ¶ 6; 720 A.2d at 571. As the plaintiffs argue, *see* Dismiss Opposition at 13, the portrait they paint of the relationship between NASE and Member Services implicates several of the 12 factors that the Law Court has highlighted as relevant to this analysis, *see, e.g., Johnson*, 1998 ME 244, ¶ 7; 720 A.2d at 571 (listing the 12 factors as "(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity[,] assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.").

From 2004 through 2007, NASE owned 100 percent of Member Services. During that time, NASE and Member Services shared the same address in Texas. Member Services performed services related to a core element of NASE's business, contracting with vendors to provide certain membership benefits to NASE members. There is no evidence that Member Services engaged in any business pursuits separate from those of NASE.

Further, as the plaintiffs suggest, *see* Dismiss Opposition at 11, there is evidence from which one reasonably can infer that Member Services had no employees, and/or relied completely on financing from NASE, in 2004, 2006, and 2007. For those three years, NASE reported that Member Services, its only taxable subsidiary or "disregarded entity," had no income or end-of-the-year assets. In 2004, NASE owed an unnamed affiliate, presumably Member Services, $4,272,827. For 2005, it claimed an amount "due to affiliate" of $4,272,827 at the beginning of the year, the same amount due to its "affiliate" at the end of 2004, and $2,448,741 at the end of the year. In 2006, it reported that it owed an unnamed affiliate, presumably Member Services, $2,448,741 at the beginning of the year, the same amount due to its "affiliate" at the end of 2005, and $1,215,361 at the end of the year.

In addition, although NASE claimed that it had 250,000 members in 2006 and 2007, and members paid a minimum of $120 per year, as a result of which it might have been expected to report income totaling at least $30,000,000, it reported income in the relevant years of approximately $5,000,000. This suffices, at the least, to raise a question of whether NASE concealed the true amount of its income.

Finally, in 2006 and 2007, all individuals whom NASE listed as its officers, directors, trustees, and/or key employees received compensation from Member Services. Most notably, Hughes received $610,875 of a total of $1,012,875 paid by Member Services to NASE's eight

officers, directors, trustees, or key employees in 2007.  Yet, in that same year, Hughes earned a total of $388,354 from NASE for work as its president/director that NASE reported averaged about 40 hours a week.  Further, in that year, Beene earned $191,250 in compensation from NASE for work as its secretary/director that NASE reported averaged about 40 hours a week, yet was also paid $98,500 from Member Services.  NASE is a non-profit, tax-exempt organization, while Member Services is a for-profit corporation.  Hughes' combined 2007 income from NASE and Member Services of $999,229, and Beene's combined 2007 income of $289,750, substantially exceeded the median compensation of $75,085 reported by one web site to be paid to administrators working for non-profit corporations with budgets of between $5 million and $10 million.  As the plaintiffs contend, *see id.* at 13-14, one reasonably can infer that Member Services' corporate form was misused to conceal the true amount of compensation paid to NASE personnel, perhaps to skirt compensation restrictions imposed on non-profit, tax-exempt organizations.

      4.      Finally, the plaintiffs make a sufficient *prima facie* showing to satisfy the second prong of Maine's veil-piercing test, inquiring whether "an unjust or inequitable result would occur if the court recognized the separate corporate existence."  *Johnson*, 1998 ME 244, ¶ 6; 720 A.2d at 571.  Given the plaintiffs' allegations that Member Services participated with NASE in certain of the alleged misconduct and their evidence suggesting that the funds, as well as the management and business affairs, of the two organizations are in some manner co-mingled, it would be inequitable for Member Services not to be held to account for damages, if proved, arising from any harm inflicted on the plaintiffs by the two organizations acting in concert.

## IV. Conclusion

For the foregoing reasons, I recommend that Member Services' motion to dismiss for lack of personal jurisdiction be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 21st day of May, 2009.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge