UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| **SCOTT SANFORD, et al.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 09-22-P-H** |
| | ) | |
| **THE NATIONAL ASSOCIATION** | ) | |
| **FOR THE SELF-EMPLOYED,** | ) | |
| **INC. et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

RECOMMENDED DECISION ON MOTION FOR
JUDGMENT ON THE PLEADINGS

Defendant the National Association for the Self-Employed, Inc. ("NASE") moves

pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings as to all seven

counts against it asserted by plaintiffs Scott Sanford and John Locke on behalf of themselves and

a putative class of Maine residents who were at some time members of NASE.  *See* Motion for

Judgment on the Pleadings ("Rule 12(c) Motion") (Docket No. 12) at 1-3; Plaintiffs' Class

Action Complaint ("Complaint"), attached to Notice of Removal (Docket No. 1), ¶¶ 1-5, 99-162.

Alternatively, NASE moves for summary judgment in its favor pursuant to Federal Rule

of Civil Procedure 56 and Local Rule 56 as to Counts III (Breach of Fiduciary Duty), IV (Duty

to Act in Good Faith), VI (24-A M.R.S.A. § 1901 *et seq*.), and VII (Failure to Account) of the

complaint.  *See* Motion for Partial Summary Judgment (Docket No. 13) at 1-2.[1]  With respect to

NASE's summary judgment motion, the plaintiffs move pursuant to Federal Rule of Civil

---

[1] The plaintiffs filed a motion for class certification, *see* Docket No. 36, which has been stayed until the court rules on the pending dispositive motions, *see* Docket Nos. 37-38.  In addition to the instant motions for judgment on the pleadings and, alternatively, partial summary judgment, the pending dispositive motions include a motion to dismiss filed by NASE's co-defendant, NASE Member Services, Inc. ("Member Services"), *see* Docket No. 8, with respect to which I issued a recommended decision on May 21, 2009, *see* Docket No. 39.

Procedure 56(f) for a continuance to permit discovery should NASE's motion not otherwise be denied.  *See* Plaintiffs' Motion for Relief Pursuant to Fed. R. Civ. P. 56(f) (Docket No. 17) at 1-2.

For the reasons that follow, I recommend that the court grant NASE's motion for judgment on the pleadings as to Counts II through VII, as well as that portion of Count I alleging negligent misrepresentation as to the value and quality of certain member benefits, *see* Complaint ¶ 106(i), and otherwise deny it.  Because this disposition, if adopted by the court, would moot NASE's alternative motion for partial summary judgment as well as the plaintiffs' Rule 56(f) motion, I have not considered them.

### I.  Applicable Legal Standards

"A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss."  *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008).  "Because a Rule 12(c) motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom."  *Id*. (citations and internal punctuation omitted).   A court "ought not, however, credit bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like."  *Aponte-Torres v. University of P.R.*, 445 F.3d 50, 55 (1st Cir. 2006) (in context of Rule 12(c) motion).

"Under *Bell Atlantic v. Twombly,* 550 U.S. 544, [555-56], 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), to survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  *Id*. (citation and internal punctuation omitted); *see also, e.g., Cook v. Gates*, 528 F.3d 42, 48 (1st Cir. 2008) ("To

survive a motion to dismiss, a complaint must allege a plausible entitlement to relief.") (citations and internal quotation marks omitted).

"In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion, [a court] may consider documents the authenticity of which are not disputed by the parties; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint." *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (citation and internal punctuation omitted). "This is true even when the documents are incorporated into the movant's pleadings." *Id.* (footnote omitted); *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

## II.  Factual Background

### A.  Allegations of Complaint

Sanford and Locke are residents of Falmouth, Maine.  Complaint ¶ 1.  Sanford was a member of NASE from August 1, 2004, through February 29, 2008.  *See id*. ¶ 4.  Locke was a member of NASE from April 1, 2005, through June 30, 2008.  *See id*. ¶ 5.  More than 10,000 Maine residents are estimated to have belonged to NASE during the class period, from August 1, 2004, through June 30, 2008.  *See id*. ¶¶ 3, 6.  At relevant times, members were required to pay NASE a $25 application fee and between $96 and $480 in annual dues.  *See id*. ¶¶ 11, 13.  Those dues were excessive and bore no relation to the *per capita* costs of operating the association.  *See id*. ¶ 14.

When Sanford and Locke joined NASE, they also enrolled in health insurance plans offered by the MEGA Life and Health Insurance Company ("MEGA Life"), a subsidiary of HealthMarkets, Inc. ("HealthMarkets").  *See id*. ¶ 18.  The majority of class members did the same.  *See id*. ¶ 19.  Through advertisements and its website, NASE promoted and endorsed MEGA Life products.  *See id*. ¶ 20.

From August 1, 2004, through December 31, 2007, NASE required members who were enrolled in MEGA Life plans to include their MEGA Life premiums with their NASE dues and to remit the total amount owed in a single payment.  *See id*. ¶ 21.  Those individuals who paid by electronic fund transfers were directed to make NASE the payee for the full amount.  *See id*. ¶ 22.  Those who paid by check were directed to combine the insurance premiums and the NASE dues into a single payment and to make the check payable to NASE.  *See id*. ¶ 23.

During the relevant period, NASE was never licensed in Maine to act as a third party administrator and did not post a bond or open and maintain an administrator trust fund.  *See id*. ¶¶ 25-27.  NASE commingled its funds with those of MEGA Life.  *See id*. ¶ 28.  NASE never provided its members with an accounting of the dues and application fees that it collected.  *See id*. ¶ 29.  In the "disclosure" section of its official website, NASE falsely claimed that "NASE dues are paid to NASE."  *Id*. ¶ 30.  In fact, NASE funneled most of the dues to outside entities without ever claiming the money as income.  *See id*. ¶ 31.

NASE is a non-profit 501(c)(6) corporation formed in 1981 and domiciled in Texas.  *See id*. ¶ 32.  At all relevant times, it has claimed a membership of approximately 250,000.  *See id*. Its purported mission is to further the interests of the nation's self-employed, which includes offering allegedly discounted benefits and services and advocating for legislation that allegedly

advanced members' interests.  *See id.* ¶ 33.  NASE is prohibited from distributing any part of its income or profit to its members, directors, or officers.  *See id.* ¶ 36.

At all relevant times, NASE was under the control and management of its board of directors.  *See id.* ¶ 37.  At all relevant times, those directors and officers acted as agents of the corporation.  *See id.* ¶ 38.  At all relevant times, the officers and directors were acting in their official capacities when they engaged in the conduct that is the subject of this complaint.  *See id.* ¶ 39.

At all relevant times, NASE held itself out as a legitimate trade organization acting in the best interests of its members.  *See id.* ¶ 40.  During the relevant period, the official NASE website and/or NASE-sponsored advertisements contained representations that included the following: (i) "Join NASE and get group rates through its insurer of choice"; (ii) "To help members accomplish their professional and personal goals, the NASE has negotiated deep discounts on a variety of products and services designed exclusively for the self-employed owner"; (iii) "NASE helps its members through the power of large numbers"; (iv) "For more than 20 years[,] NASE has provided a helping hand to this vital segment [the self-employed] of the American economy"; (v) [NASE President Robert] Hughes brings a unique understanding of the issues, challenges and opportunities faced by the self-employed"; (vi) "The association looks out for you, our members"; (vii) "NASE's exclusive package of member benefits allows you to save money on your personal and professional expenses"; (viii) "The [NASE] board believes that the primary responsibility of directors is to oversee the affairs of the association to the benefit of its members"; (ix) "With the NASE as your advocate, your voice is heard on Capitol Hill concerning an array of issues that affect the self-employed"; (x) "The membership dues derived from the sale of memberships go to the NASE"; (xi) "The responsibility of [NASE] directors is

to exercise their business judgment . . . in what they reasonably believe to be in the best interests of the association and its members"; (xii) "The board believes that the long-term success of the association is dependent upon the maintenance of an ethical business environment"; and (xiii) "The company believes that candidates for election to the board should . . . possess the highest personal and professional ethics, integrity and values, and be committed to representing the long-term interests of the members." *See id.* ¶ 41.

In 2004, NASE had six employees. *See id.* ¶ 42. In 2005 and 2006, it had eight employees. *See id.* ¶ 43. At all relevant times, its board of directors numbered at least eight and as many as nine. *See id.* ¶ 44.

At some point during the relevant period, NASE offered its members a credit card called the "NASE Platinum Plus Business Rewards MasterCard." *See id.* ¶ 45. The organization was entitled to a commission or rebate each time the card was used. *See id.* ¶ 46. At all relevant times, NASE sold ancillary products to its members, such as the Caremark Discount Pharmacy Card. *See id.* ¶ 47. NASE referred to these ancillary products as "member benefits." *See id.* Every time a NASE member bought or used one of these ancillary products, NASE was entitled to a commission from the product vendor. *See id.* ¶ 48.

At all relevant times, NASE earned between $60 million and $100 million per year. *See id.* ¶ 49. At all relevant times, NASE grossly underestimated its income, both in its annual report to members and in its federal Form 990 tax filings. *See id.* ¶ 51. NASE reported the following income on its federal tax returns: (i) $4,211,543 in 2004, (ii) $3,424,402 in 2005, and (iii) $4,643,598 in 2006. *See id.* ¶ 52.

At all relevant times, Hughes was the president of NASE and a member of its board of directors. *See id.* ¶ 53. Hughes is a certified public accountant and a co-owner of a Texas

accounting firm known as Hall & Hughes. *See id*. ¶ 54. Hughes and the rest of the NASE board have used accounting gimmicks to conceal the extent of NASE's earnings. *See id*. ¶ 55. At all relevant times, NASE funneled at least 90 percent of its income to a handful of for-profit entities that allegedly were unrelated entities. *See id*. ¶ 56.

NASE entered into a series of one-sided contracts with a handful of for-profit corporations in which it paid exorbitant amounts for unnecessary and overpriced services. *See id*. ¶ 58(a). It agreed to forgo commissions from the sale of ancillary products, directing that they be paid instead to unrelated organizations. *See id*. ¶ 58(b). It commingled its dues and application fee income with money belonging to unrelated entities. *See id*. ¶ 58(c). It paid its sales agents exorbitant commissions. *See id*. ¶ 58(d). Its board of directors awarded themselves exorbitant compensation. *See id*. ¶ 58(e). Its directors and officers overpaid various business associates, friends, and family for their work as "consultants," officers, and employees. *See id*. ¶ 58(f). Its directors spent lavishly and unnecessarily on travel, lodging, occupancy, and consulting services. *See id*. ¶ 58(g). NASE was able to perpetuate this scheme by withholding pertinent information from its members. *See id*. ¶ 59.

The NASE board prevented and/or discouraged member participation in the selection of individual directors. *See id*. ¶ 60. NASE members were not allowed to nominate or otherwise propose candidates for the board. *See id*. ¶ 61. Instead, the board's governance committee controlled the nominating process. *See id*. ¶ 62. In addition, members could not vote by proxy, but were instead required to travel to Texas and cast their votes in person at the annual meeting. *See id*. ¶ 63. There were no regional meetings of NASE members. *See id*. ¶ 64. NASE had no regional chapters. *See id*. ¶ 65. NASE members were not provided with the names, addresses, or telephone numbers of fellow members. *See id*. ¶ 66. NASE did not provide a means for

members to network.  *See id.* ¶ 67.  Telephone calls to NASE were fielded by employees of allegedly unrelated for-profit entities.  *See id.* ¶¶ 56, 68.

Member Services is a wholly-owned affiliate of NASE.  *See id.* ¶ 69.  At all relevant times, the NASE board of directors also served as Member Services officers.  *See id.* ¶ 70.  During the relevant period, the NASE website made no reference to Member Services.  *See id.* ¶ 71.  Member Services was not mentioned in any of the annual reports.  *See id.* ¶ 72.  NASE never informed its members that, in 2005, Member Services earned income in the amount of $1.2 million.  *See id.* ¶ 73.  NASE never informed its members that, in 2005, Member Services held $8 million in assets.  *See id.* ¶ 74.  NASE concealed from its members that, in 2006, Member Services had nine officers.  *See id.* ¶ 75.  These were the same nine individuals who were serving on the NASE board.  *See id.* ¶ 76.  NASE concealed from its members that, in 2006, Member Services paid its officers a total of $248,500 in compensation.  *See id.* ¶ 77.  NASE never informed its members that, in addition to the $437,000 that Hughes received from NASE in 2006, he received $29,500 in compensation from Member Services.  *See id.* ¶ 78.  NASE never informed its members that, in 2006, it and Member Services paid the officers and directors a total of $921,500.  *See id.* ¶ 79.  NASE never informed its members that, in 2005, it "owed" approximately $4.3 million to an unidentified "affiliate."  *See id.* ¶ 80.

NASE marketed itself in a number of ways, including, but not limited to, the NASE website, print and radio advertisements, press releases, and individual advertisements of its sales agents.  *See id.* ¶ 81.  NASE memberships and ancillary products were sold in conjunction with MEGA Life insurance.  *See id.* ¶ 82.  NASE and MEGA Life products were sold by individual agents.  *See id.* ¶ 83.  These agents sold only NASE and MEGA Life products and services, or products and services that these two entities specifically endorsed.  *See id.* ¶ 84.  At all relevant

times, MEGA Life or another for-profit entity was responsible for recruiting and training these sales agents. *See id.* ¶ 85.

Even though these agents sold only MEGA Life and NASE-sponsored products, and even though MEGA Life and/or HealthMarkets controlled their job training, the agents were technically self-employed. *See id.* ¶ 86. MEGA Life referred to the sales agents as "self employed agents" or "our dedicated sales force." *See id.* ¶ 87. "Dedicated" meant that these agents sold only HealthMarkets insurance or products that HealthMarkets approved or endorsed. *See id.* ¶ 88. NASE referred to these same individuals as "our field service representatives," or FSRs. *See id.* ¶ 89. These agents earned a commission every time they sold a MEGA Life policy. *See id.* ¶ 90. They also earned a commission every time they enrolled someone in NASE. *See id.* ¶ 91. NASE not only paid a commission for each new member but also paid commissions for each veteran member. *See id.* ¶ 92.

NASE sales commissions were not based on members' dues and fees but instead on the amount members spent on MEGA Life premiums. *See id.* ¶ 93. Agents earned the bulk of their income from the sale of health insurance. *See id.* ¶ 94. When they met with potential clients, they focused mainly on health insurance, as opposed to NASE membership or NASE products. *See id.* ¶ 95. NASE paid HealthMarkets and other for-profit entities excessive amounts for the recruitment and training of these FSRs and for the marketing of NASE memberships and NASE-sponsored products. *See id.* ¶¶ 96-97. NASE paid HealthMarkets and other for-profit entities excessive amounts for administrative services that included collecting application fees and dues, customer service, record-keeping, enrolling new members, and procurement and management of member benefits. *See id.* ¶ 98.

## B. Legal Claims

In their seven-count complaint, the plaintiffs allege on behalf of themselves and all Maine residents who belonged to NASE between August 1, 2004, and June 30, 2008, that:

1.      The defendants made negligent misrepresentations (Count I).  *See id.* ¶¶ 99-110. Specifically, NASE (i) grossly underreported its earnings, (ii) concealed the amount of money that it paid for administrative services, (iii) concealed the fact that it overpaid for these services, (iv) concealed the exorbitant compensation that it paid its officers and directors, (v) concealed the existence of its subsidiary, Member Services, and the role that Member Services played in these illegal activities, (vi) concealed that its directors and officers approved numerous and substantially overpriced, unnecessary, and one-sided financial deals with friends and business partners, (vii) concealed that, despite its claims to the contrary, some of the "member benefits" were not being offered at a discount, (viii) concealed that it had never requested discounts on those benefits, (ix) misrepresented the value and quality of certain member benefits, and (x) concealed that its application fee and annual dues were excessive.  *See id.* ¶ 106.

2.      The defendants breached their contract with members.  *See id.* ¶¶ 111-19.  They did so in the manner set forth in paragraph 106, above, as well as by overcharging the plaintiffs for dues, member services, and application fees, squandering the members' assets, and concealing the nature and extent of this misconduct.  *See id.* ¶¶ 116-17.

3.      The defendants breached their fiduciary duty to the plaintiffs (Count III).  *See id.* ¶¶ 120-30.  They did so by charging excessive fees and dues, underreporting the association's income, forgoing commissions on member benefits, overpaying outside entities for administrative services, engaging in sham transactions with outside entities, paying their officers and directors excessive compensation, paying consultants excessive fees, paying exorbitant

amounts for travel, occupancy, and other business expenses, and concealing the nature and extent of those financial improprieties from the members.  *See id*. ¶ 129.

4.      NASE violated its duty to act in good faith pursuant to 13-B M.R.S.A. § 717 (Count IV).  *See id*. ¶¶ 131-39.  Specifically, NASE directors and officers (i) intentionally misled members about the organization's revenues, (ii) knowingly overpaid for administrative services such as agent commissions, acquisition of member benefits, and marketing, (iii) paid themselves exorbitant salaries and compensation, (iv) hired their business associates as consultants and paid them exorbitant fees, (v) spent excessive amounts on consultant fees, programs, travel, and other expenses, (vi) prevented members from active and meaningful participation in the nomination and election of directors, (vii) charged excessive application fees and annual dues, (viii) failed to remit to the members the commissions earned from the sale of ancillary services, also known as "member benefits," or, in the alternative, failed to apply them to the association's overhead costs, (ix) entered into multiple one-sided contracts with outside corporations in which NASE paid for unnecessary and/or overpriced services, (x) failed to negotiate discounts from suppliers of member benefits despite the obligation to do so, (xi) cooperated with private health insurance carriers and the health insurance industry in general, to the detriment of the association members by pursuing legislative, policy, and business goals favored by the insurance industry but antithetical to the members' interests, (xii) concealed the nature and extent of this cooperation from members, and (xiii) misrepresented the nature and quality of some member benefits.  *See id*. ¶ 136.

5.      The defendants engaged in constructive fraud (Count V), inducing members to transfer assets to them in the form of fees and dues and exploiting an undue advantage over the members, to their economic detriment.  *See id*. ¶¶ 140-51.

6.      NASE violated 24-A M.R.S.A. § 1901 *et seq.* (Count VI) by acting as MEGA Life's third-party administrator without obtaining a license to operate as such, failing to post a bond, and co-mingling its funds with those of MEGA Life, in contravention of 24-A M.R.S.A. § 1901 *et seq.*  *See id.* ¶¶ 152-58.

7.      The defendants failed to fulfill their duty of accurate accounting with respect to NASE's finances (Count VII).  *See id.* ¶¶ 159-62.

### III.  Discussion

### A.  Breaches of Fiduciary, Statutory Duties (Counts III, IV, and VII)

NASE seeks judgment on the pleadings as to Counts III, IV, and VII on grounds that under Texas law, which is applicable pursuant to the "internal affairs doctrine," (i) the duties assertedly breached are owed to the corporation, not to members, and would be redressable only *via* a derivative action in the corporation's name, (ii) Texas does not permit members of a nonprofit association to maintain a derivative action, and (iii) even if the directors owed a duty of care directly to the members, the corporation cannot be held vicariously liable for breaches of any such duties.  *See* Rule 12(c) Motion at 4-7.  Finally, NASE argues that to the extent that there are rights that an individual member can enforce, the plaintiffs are no longer members of the corporation and have no rights to enforce.  *See id.* at 7.

The plaintiffs acknowledge that pursuant to Texas law, which they assume applies, directors do as a general rule owe a fiduciary duty to the corporation, not to its members.  *See* Plaintiffs' Reply to Defendant NASE's Motion To Dismiss for Failure To State a Claim ("Rule 12(c) Opposition") (Docket No. 18) at 3.  However, they point out that "[a] fiduciary relationship may arise from formal and informal relationships and may be created by contract."  *Id.* (quoting *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App. 2008)).  They argue that, (i) by virtue of

various pronouncements on NASE's official website, the directors transferred their fiduciary responsibilities from the corporation to the members, (ii) this was done at the direction of the corporation, and (iii) in so doing, the directors were acting as the corporation's agents. *See id.* at 6. They add, alternatively, that they have alleged sufficient facts to show that the corporation itself directly assumed, and was acting under, a fiduciary duty to members, through statements made on its official website and in advertisements. *See id.*

Finally, while they concede that, under Texas law, members of a nonprofit association may not maintain a derivative action, they assert that Texas provides an alternative form of redress *via* "a proceeding by the corporation . . . through members in a representative suit" alleging that an "act, conveyance or transfer was . . . beyond the scope . . . [of legal] authority" of a corporation's directors and officers. *Id.* at 8 (quoting Tex. Bus. Orgs. Code § 1396-2. 03).

NASE rejoins that, on its face, the plaintiffs' claim of a transfer of fiduciary duties to the members makes no sense. *See* Defendant National Association for the Self-Employed, Inc.'s Reply to Plaintiffs' Opposition to Motion for Judgment on the Pleadings ("Rule 12(c) Reply") (Docket No. 33) at 2-3. NASE reasons that it is not meaningful to speak of the corporation subordinating its interest to the collective interest of the members that comprise it when the only interest of those members, as a collective, is the interest of the corporation. *See id.* at 3. In any event, NASE argues, the website pronouncements and promotional materials on which the plaintiffs rely do not, as a matter of law, satisfy the demanding test for creation of a fiduciary relationship. *See id.* at 3-4. To the extent that the plaintiffs rely, in the alternative, on Tex. Bus. Orgs. Code § 1396-2. 03, NASE points out that they neither bring a proceeding in the name of the corporation nor allege an *ultra vires* act of a director or officer. *See id.* at 3 n.5.

In support of their transfer of duties argument, the plaintiffs rely on the following pronouncements on NASE's official website:

1.      Under the subheading, "Direct the Affairs of the Association for the Benefit of the Members": "The Board believes that the *primary responsibility* of directors is to oversee the affairs of the Association *for the benefit of the members*."  Rule 12(c) Opposition at 4 (emphasis added by plaintiffs).

2.      Under the "Governing Principles" section: "[t]he responsibility of directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Association and its members[,]" and "The Board believes that the long-term success of the Association is dependent upon the maintenance of an ethical business environment[.]" *Id*. at 5.

3.      Under the heading "Board Structure": "The *company* believes that candidates for election to the Board should . . . have broad experience and the ability to exercise sound business judgment, possess the highest personal and professional ethics, *and be committed to representing the long-term interests of the members*." *Id*. at 5-6 (emphasis added by plaintiffs).

In addition, the plaintiffs posit that a number of additional statements on NASE's website and in its advertisements underscore this position, including its claims of (i) forceful legislative advocacy designed to further the interests of the self-employed, (ii) the availability of a broad range of discounted benefits exclusively designed for the self-employed, (iii) a unique understanding of the issues and challenges facing the self-employed, (iv) a promise to "look out for" the members' interests and "provide a helping hand to this vital segment" of the economy, and (v) a recognition of the "critical [need] for micro-business owners to be armed with the information necessary to make the best health care choices." *Id*. at 7.

"Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly." *Cotten v. Weatherford Bancshares, Inc*., 187 S.W.3d 687, 698-99 (Tex. App. 2006) (footnote omitted).  While "an informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence[,]" imposition of an informal fiduciary duty requires that the "relationship of trust and confidence must exist prior to, and apart from, the agreement that is the basis of the suit." *Lundy*, 260 S.W.3d at 502.  *See also, e.g., Harris ex rel. Harris v. Spires Council of Co-Owners*, 981 S.W.2d 892, 898 (Tex. App. 1998) ("[A] fiduciary relationship is an extraordinary one that the law does not recognize lightly. That a person subjectively trusts another does not, without more, indicate that the person placed confidence in another in the sense demanded by a fiduciary relationship.  Something apart from the transaction between the parties is required.") (citations omitted).

The NASE marketing materials on which the plaintiffs rely do not suffice, as a matter of law, to establish a transference of fiduciary duties to NASE's individual members.  Those materials simply reflect the truism that in acting in the best interests of the association, its directors and officers are, or should be, acting in individual members' best interests because the association exists for the purpose of furthering the interests of, and providing tangible benefits to, its members, the self-employed.

What is more, the complaint is devoid of any allegations from which one reasonably could conclude that NASE developed a relationship of trust and confidence with the plaintiffs prior to, and apart from, the membership agreement that forms the basis of this suit.  To the contrary, the complaint indicates that, after obtaining NASE memberships, the plaintiffs became disenchanted with the membership association on a number of levels.

Finally, as NASE notes, the plaintiffs' reliance, in the alternative, on Tex. Bus. Orgs. Code § 1396-2. 03 is unavailing. The plaintiffs do not bring an action on behalf of the corporation, but rather on their own behalf. *See* Complaint ¶ 2. Moreover, in neither their complaint nor their brief opposing NASE's Rule 12(c) motion do they illuminate how the conduct of which they complain was *ultra vires*, that is, beyond the authority of officers or directors.

Because Counts III, IV, and VII state no plausible claim of entitlement to relief, NASE's motion for judgment on the pleadings with respect to them should be granted.[2]

## B. Negligent Misrepresentation (Count I)

NASE next seeks judgment on the pleadings as to Count I, alleging negligent misrepresentation, on grounds that the plaintiffs fail to state a claim as to the two affirmative representations and eight alleged misrepresentations by omission enumerated in paragraph 106 of the complaint. *See* Rule 12(c) Motion at 7-8. NASE argues that:

1.     With respect to the alleged affirmative misrepresentation of grossly underreporting its earnings, *see* Complaint ¶ 106(a), the plaintiffs rely on underreporting on NASE's Form 990, yet Congress provides no private right of action under the Internal Revenue Code for such underreporting, *see* Rule 12(c) Motion at 8.

2.     With respect to the alleged affirmative misrepresentation as to "the value and quality of certain member benefits[,]" Complaint ¶ 106(i), misrepresentations as to value and quality, even if made with fraudulent intent, are not actionable, *see* Rule 12(c) Motion at 9.

---

[2] In addition, as NASE observes, *see* Rule 12(c) Reply at 6, the plaintiffs separately oppose judgment on the pleadings as to Count VII, which seeks an equitable accounting, not on the basis of its viability as a stand-alone cause of action but rather on the basis of its availability as a remedy, *see* Rule 12(c) Opposition at 15-16; *see also, e.g., Adams v. Catrambone*, 359 F.3d 858, 861 & n.2 (7th Cir. 2004) ("Adams also seeks other forms of relief – an accounting, back wages, and reimbursement of business expenses – that he styles as 'counts,' but that are really just remedies to which he might be entitled if he were to prevail on his substantive claims. . . . An accounting is a form of equitable relief incidental to a substantive claim.").

3.      With respect to the eight alleged misrepresentations by omission, *see* Complaint

¶ 106(b)-(h) & (j), the Law Court recognizes a failure to disclose information as an actionable

negligent misrepresentation only when there is a statutory duty to disclose, the plaintiffs identify

none, and there is none, *see* Rule 12(c) Motion at 9-11.

The plaintiffs do not contest that they fail to identify a relevant statutory duty to disclose.

*See* Rule 12(c) Opposition at 10-11.  They clarify that they rely on the doctrine of "partial

disclosure," which provides:

> It is a well established principle of tort law that one who voluntarily elects to
> make a partial disclosure is deemed to have assumed the duty to tell the whole
> truth, i.e., to make full disclosure even though the speaker was under no duty to
> make the partial disclosure in the first place. . . .  The comments to section 551 [of
> the Restatement (Second) of Torts] recognize that there is a distinction between
> remaining silent and saying nothing about a defect, which is not actionable unless
> a special duty exists, and disclosing half truths or misleading[,] ambiguous
> statements which another may rely upon to his detriment.

*See id*. at 10 (quoting *Bradley v. Kryvicky*, 574 F. Supp.2d 210, 220 (D. Me. 2008)).

They argue that NASE's annual reports, to the extent that they (i) disclosed a fraction of

its income, (ii) omitted any mention of excessive compensation paid to directors and officers,

and (iii) omitted any mention of the millions of dollars going to unrelated entities, made "partial

disclosures" that misled members about material aspects of the association's business.  *See id*. at

10-11.

NASE rejoins that (i) all of the alleged partial disclosures of which the plaintiffs

complain were made in annual reports that reported figures from its Form 990s, and (ii) the

plaintiffs offer no basis for their implicit claim that there is a private right of action for error on a

Form 990.  *See* Rule 12(c) Reply at 6.  NASE adds that republication in other public documents,

such as annual reports, of figures contained in Form 990s "should not suddenly create such a

private right."  *Id*. at 6 n.9.

NASE's bid for judgment on the pleadings as to nine of the 10 asserted misrepresentations contained in paragraph 106 of the complaint, all but paragraph 106(i), hinges on its implication that lack of a private right of action as to IRS Form 990s bars a state tort claim for negligent misrepresentation.   Yet NASE cites no authority for *that* proposition, *see* Rule 12(c) Motion at 8; Rule 12(c) Reply at 6, and my research reveals reason to doubt that it is so, given that the tort of negligent misrepresentation can be predicated on disclosures made in public filings, *see, e.g., Clark v. Danek Med., Inc*., 64 F. Supp.2d 652, 654 (W.D. Ky. 1999) (while plaintiffs had no express or implied federal private right of action for alleged fraud on Federal Drug Administration ("FDA"), federal law did not preempt state common law claims predicated on allegedly fraudulent statements made to the FDA, provided requisites of state law of fraudulent or negligent misrepresentation were met).

NASE accordingly falls short of making a persuasive case for judgment on the pleadings as to the alleged misrepresentations contained in subsections (a) through (h) and (j) of paragraph 106 of the complaint.

NASE is correct, however, that the allegation that it "misrepresented the value and quality of certain member benefits[,]" Complaint ¶ 106(i), fails to state a claim as to which relief can be granted.   The plaintiffs target, *inter alia*, statements by NASE that it placed the needs of members above all others, that its advice was trustworthy, and that member benefits were provided at a discount.  *See* Rule 12(c) Opposition at 9.  This is the equivalent of non-actionable "dealer's talk."  *See, e.g., Eaton v. Sontag*, 387 A.2d 33, 37-38 (Me. 1978) ("In the absence of false representations of fact respecting the actual expenses incurred in the development, there would be no actionable fraud, for misrepresentations as to value and quality of land made by the vendor, even though made with fraudulent intent, are not actionable. . . .   The law recognizes the

fact that sellers may naturally overstate the value and quality of the articles or property which they have to sell.  Everybody knows this, and a buyer has no right to rely upon such statements.").

For these reasons, I recommend that NASE's bid for judgment on the pleadings as to Count I be granted with respect to alleged misrepresentations as to the value and quality of certain member benefits, *see* Complaint ¶ 106(i), but otherwise denied.

### C.  Breach of Contract (Count II)

NASE next seeks judgment on the pleadings as to the plaintiffs' claim for breach of contract (Count II) on the ground that none of the contractual rights allegedly breached is traceable to the NASE bylaws and articles and incorporation, which are the sole sources from which members' contractual rights spring.  *See* Rule 12(c) Motion at 11-13.  For this proposition NASE cites an Arizona case, *Rowland v. Union Hills Country Club*, 757 P.2d 105 (Ariz. Ct. App. 1988).  *See id*. at 11; *see also Rowland*, 757 P.2d at 108 ("The rights of members of a private organization are governed by the articles of incorporation and by-laws, which constitute a contract between the members and the organization[.]").

NASE further argues that, to the extent the plaintiffs allege that they were overcharged for dues, member services, and application fees, it is black-letter law that courts will not second-guess the parties' determination of the value or adequacy of the consideration in a voluntary exchange.  *See* Rule 12(c) Motion at 12; *see also, e.g.*, Restatement (Second) of Contracts § 79 cmt. c (1981) ("Valuation is left to private action in part because the parties are thought to be better able than others to evaluate the circumstances of particular transactions.").

The plaintiffs rejoin that, even assuming that Maine courts have accepted the reasoning of the *Rowland* court, which they do not concede, NASE's articles of incorporation and bylaws

permit it to enter into contracts and do not allow it to breach such contracts at will.  *See* Rule 12(c) Opposition at 11-12.  They clarify that they claim that NASE breached certain promises made through advertisements and its website by:

1.   "[A]pproving exorbitant compensation for its officers and directors (agents)[.]" *Id*. at 13.

2.   "[E]ntering into various one sided contracts with unrelated entities in which NASE paid for overpriced and/or unnecessary services[.]" *Id*.

3.   "[F]ailing to bargain for or obtain discounts on certain ancillary benefits[.]" *Id*. at 13-14.

4.   "[F]ailing to collect commissions to which it was entitled from the sale of ancillary products (and diverting them instead to unrelated entities)[.]" *Id*. at 14.

5.   "[C]harging the members excessive fees and dues[.]" *Id*.

6.   "[P]roviding its members with false and misleading information about these activities." *Id*.

NASE responds that the first three and the last of these points are at most claims that officers or directors dealt irresponsibly with corporate assets and opportunities and misled the corporation about those matters.  *See* Rule 12(c) Reply at 1.  Yet, NASE points out, the corporate assets are not the property of the members, who have no contractual claim to those assets or to have them dealt with in any particular way.  *See id*.  NASE argues that the fourth and fifth points are simply complaints about the value of consideration provided in a voluntary exchange and, on that basis, are not actionable.  *See id*. at 2.

As a threshold matter, the *Rowland* case indeed comports with Maine law.  *Compare Rowland*, 757 P.2d at 108 *with, e.g., Triple-A Baseball Club Assocs. v. Northeastern Baseball,*

*Inc.*, 655 F. Supp. 513, 543 (D. Me.), *rev'd in part on other grounds*, 832 F.2d 214 (1st Cir. 1987) ("It is well settled under Maine law that the constitution and bylaws of an organization such as the International League constitute an enforceable contract between the members and the organization and govern their mutual rights and liabilities, provided that said rules are not unreasonable, illegal, or contrary to public policy.") (footnote omitted); *Morison v. Wilson Lake Country Club*, 2005 ME 71, ¶ 20, 874 A.2d 885, 890-91 ("If the bylaws of a private association are not unreasonable, nor contrary to public policy nor to constitutional or statutory requirements, they are a valid enforceable contract between members and the association which govern their mutual rights and responsibilities.") (citation and internal punctuation omitted).

Even assuming *arguendo* that the website and advertising language on which the plaintiffs rely creates enforceable contractual rights in their favor, that language does not grant them the right to control disposition of the association's assets.[3]  NASE accordingly could not have breached any contract *with members* by engaging in the conduct complained of in the first four and last points.[4]

With respect to the fifth point, that NASE charged members excessive fees and dues, NASE makes a persuasive argument that, as a matter of law, no breach of contract can be said to have occurred on the basis of payment of allegedly excessive fees and dues that the members

---

[3] The plaintiffs rely on the following asserted promises made on the NASE website and in NASE-sponsored advertisements: (i) to "[provide] group rates [to its members] through its [health] insurer of choice[,]" (ii) to provide "deep discounts on a variety of products and services[,]" (iii) "to provide[] a helping hand[,]" "advocat[e] for your interests[,]" "provide . . . support and advice[,]" "bring[] a unique understanding of the issues, challenges and opportunities faced by the self-employed[,]" and to "look[] out for you, our members[,]" (iv) to "oversee the affairs of the association for the benefit of its members[,]" (v) to act as "your advocate . . . on Capitol Hill concerning an array of issues that affect the self-employed[,]" (vi) to be "a partner behind the scenes who knows and understands the issues [the self-employed] have, and [to] give them the support they need[,]" (vii) to "provide accurate information on price and quality [of health care options,]" (viii) to remit all of the members' dues and fees to the association, and (ix) to support "candidates for election to the board [of directors] . . . [who] possess the highest personal and professional ethics, integrity and values, and [who are] committed to representing the long-term interests of the members." Rule 12(c) Opposition at 12-13 (quoting Complaint ¶ 41).

[4] NASE characterizes the fourth point as a complaint about the value or adequacy of consideration in a voluntary exchange. *See* Rule 12(c) Reply at 2.  I think it is more properly grouped with the first three and last points, as a complaint about the manner in which the association's assets were managed.

voluntarily agreed to pay.  *See, e.g., Hamer Holding Group, Inc. v. Elmore*, 560 N.E.2d 907, 917

(Ill. App. Ct. 1990) ("Whether $5,000 or $500,000, and whether or not there be a tax advantage

to account for it, as long as it is bargained for, the amount the parties assign to a particular asset

constitutes legally adequate consideration."); Restatement (Second) of Contracts § 79 cmt. c

("Ordinarily, . . . courts do not inquire into the adequacy of consideration.  This is particularly so

when one or both of the values exchanged are uncertain or difficult to measure. But it is also

applied even when it is clear that the transaction is a mixture of bargain and gift. . . . Gross

inadequacy of consideration may be relevant to issues of capacity, fraud and the like, but the

requirement of consideration is not a safeguard against imprudent and improvident contracts

except in cases where it appears that there is no bargain in fact.").

NASE accordingly is entitled to judgment on the pleadings as to Count II.

### D.  Constructive Fraud (Count V)

NASE next seeks judgment on the pleadings as to Count V, alleging constructive fraud,

on the basis that the complaint on its face fails to make out one or more of the elements of that

tort.  *See* Rule 12(c) Motion at 13-14.  As a threshold matter, NASE asserts that the plaintiffs fail

to make out the requisite element of a transfer of property to a grantee who promises to hold it

for the plaintiff's benefit.  *See id*. at 14.  In any event, NASE contends, the plaintiffs cannot

establish that they acted in reliance on a relationship of trust with NASE.  *See id*.  NASE posits

that a non-profit corporation is not a fiduciary for its members and is free to spend corporate

assets in ways, and to advocate for causes, that individual members find objectionable or do not

support.  *See id*.

The plaintiffs argue that they need not show that they transferred property to NASE, or

that NASE promised to hold it for their benefit, to prevail on a claim of constructive trust.  *See*

Rule 12(c) Opposition at 14.  Rather, they note, they need only show that "one party has obtained some benefit from the other through undue influence or breach of a fiduciary or confidential relation."  *Id*. (quoting *Gaulin v. Jones*, 481 A.2d 166, 168 (Me. 1984)).  They contend that they have alleged sufficient facts to make out such a claim, having asserted that:

1.     NASE induced them to pay dues and fees and to purchase ancillary products.  *See id*. at 15.

2.     They did so because they trusted NASE to act in members' best interests and believed that it had the resources, expertise, experience, and personnel to advance members' interests, educate them on important issues, and bargain effectively with outside vendors.  *See id*.

3.     As a result of NASE's behavior and the fiduciary relationship between the parties, NASE obtained a benefit from the members in the form of millions of dollars in excess fees and dues.  *See id*.

The plaintiffs are correct that constructive fraud can be shown *via* demonstration "that one party has obtained some benefit from the other through undue influence or breach of a fiduciary or confidential relation."  *Kobritz v. Severance*, 2007 ME 3, ¶ 14 n.5; 912 A.2d 1237, 1241 n.5 (citation and internal quotation marks omitted).  Yet, as NASE points out, *see* Rule 12(c) Reply at 5 n.7, the plaintiffs' reposing of trust in NASE's sales and marketing materials is insufficient as a matter of law to raise a plausible claim of undue influence or of the existence of a fiduciary or confidential relationship between NASE and its members, *see, e.g., Taylor v. Ford Motor Co*., Civil No. 06-69-B-W, 2006 WL 2228973, at *4-*5 (D. Me. Aug. 3, 2006) ("The ordinary buyer-seller relationship, even where the seller has superior bargaining power and knowledge, is not a fiduciary one. Sellers may routinely make representations concerning their

product, often on the basis of a claimed expert knowledge about its utility and value, without

becoming fiduciaries.") (citation and internal quotation marks omitted) (applying Maine law).

NASE accordingly is entitled to judgment on the pleadings as to Count V.

### E. Maine Insurance Code Claim (Count VI)

NASE finally seeks judgment on the pleadings as to Count VI on the ground that there is

no private right of action under the statutory scheme set forth in chapter 18 of the Maine

Insurance Code, 24-A M.R.S.A. §§ 1901-12, governing insurance administrators.  *See* Rule 12(c)

Motion at 15; *see also, e.g., In re Wage Payment Litig.*, 2000 ME 162, ¶ 7, 759 A.2d 217, 222

("[W]hen the Legislature deems it essential that a private party have a right of action, it has

expressly created one.  For the purpose of the creation of a private right of action, the Legislature

expresses its intent in the statutory language or in the legislative history.") (citation and internal

quotation marks omitted).

The plaintiffs point to language in 24-A M.R.S.A. § 1909 that they assert "places a clear

duty – fiduciary in nature – on anyone who collects or receives insurance premiums from Maine

residents, and who does so on behalf of the insurance carrier."  Rule 12(c) Opposition at 18; *see*

*also* 24-A M.R.S.A. § 1909(1) & (10) ("Administrators shall hold in a fiduciary capacity all

contributions and premiums received or collected on behalf of a plan sponsor or insurer . . . .

Failure to accurately maintain the required books and records in a timely manner is deemed to be

untrustworthy, hazardous or injurious to participants in the plan or the public and financially

irresponsible.").

Yet this language does not expressly state that the fiduciary duties in question are

redressable by means of a private cause of action, and the plaintiffs identify no legislative history

so signifying.  *See* Rule 12(c) Opposition at 18.  In the circumstances, no private right of action

can be discerned.  *See, e.g., El-Hajj v. Fortis Benefits Ins. Co.*, 156 F. Supp.2d 27, 32 (D. Me. 2001) (section of Maine Insurance Code prohibiting insurers from disparate treatment of insureds based on physical or mental handicaps absent sound actuarial basis for distinction, 24-A M.R.S.A. § 2159-A, did not create a private right of action in favor of insureds); *Witt v. Aetna U.S. Healthcare, Inc.*, No. COV. 00-31-B-C, 2000 WL 1336491, at *3 (D. Me. Sept. 14, 2000) (rec. dec., *aff'd* Nov. 21, 2000) (sections of Maine Insurance Code prohibiting unfair methods, deceptive acts, and false advertising, 24-A M.R.S.A. §§ 2152, 2154, did not create a private right of action in favor of insureds).

NASE accordingly is entitled to judgment on the pleadings as to Count VI.

## IV. Conclusion

For the foregoing reasons, I recommend that NASE's motion for judgment on the pleadings be ***GRANTED*** as to Counts II through VII of the plaintiffs' complaint, as well as that portion of Count I alleging negligent misrepresentation as to the value and quality of certain member benefits, *see* Complaint ¶ 106(i), but otherwise ***DENIED***.  Because this disposition, if adopted by the court, would moot NASE's alternative motion for partial summary judgment and the plaintiffs' Rule 56(f) motion, I have not considered them.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

***Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.***

Dated this 26th day of May, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge